# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:22MJ 312 |
| Information associated with Facebook ID 100079301172745 stored at premises controlled by Meta Platforms, Inc. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Possession of a firearm by a convicted felon |
| 18 U.S.C. § 922(o) | Possession of a Machine gun |
| 18 U.S.C. § 933 | Firearms Trafficking |

The application is based on these facts:

See Affidavit of Special Agent Carmen E. L. Basgall

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Carmen E. L. Basgall
*Applicant's signature*

Carmen E. L. Basgall, Special Agent (ATF)
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 8/9/2022

*Judge's signature*

City and state: Winston-Salem, North Carolina       The Hon. Joi E. Peake, U.S. Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100079301172745 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 1:22mj312 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Carmen E. L. Basgall, a Special Agent with the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been since June 2020.  Prior to working with ATF, I graduated from Appalachian State University in August 2015 with a bachelor's degree in Criminal Justice and December 2016 with a master's degree in Public Administration. I was employed as a Special Agent with North Carolina Alcohol Law Enforcement from June 2017 until June 2020.  I

have received various training including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center located in Glynco, Georgia, the Special Agent Basic Training Program at the ATF National Academy, North Carolina Basic Law Enforcement Training, The North Carolina Alcohol Law Enforcement Special Agent Training Academy, and North Carolina Police Law Institute. The aforementioned trainings included formal training in affidavit and search warrant preparation as well as formal education in federal firearms laws. I am currently assigned to ATF's Charlotte Field Division and stationed at the Fayetteville Field Office.

3. During the course of my employment with ATF, I have been personally involved in a number of firearms trafficking, manufacturing, and possession cases. My training and experience in the investigation of the illegal possession and trafficking of firearms has provided me with information concerning the normal patterns and procedures through which individuals acquire, store, maintain, and/or manufacture firearms. I have had discussions with senior ATF agents with further experience and/or expertise in conducting investigations related to individuals who unlawfully possess and traffic in firearms. As a result of my own personal experiences, the training I have received, and the information that I have obtained from working with other experienced ATF agents, I am familiar with violations of Federal Firearms Laws.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of:

a. 18 USC § 922(g)(1), which prohibits a person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year from possessing a firearm;

b. 18 USC § 922(o), which prohibits a person from transferring or possessing a machinegun; and

c. 18 USC § 933, which prohibits a for a person from transferring or receiving, or attempting or conspiring to transfer or receive, a firearm if they know or have reasonable cause to believe the use, carrying, possession, or receipt would constitute any Federal or State felony;

have been committed by KEVIN RAY FRIER.

6. Additionally, I am aware through my training and experience that:

a. Persons involved in the unlawful sale, possession, and/or manufacture of firearms often take photographs or videos of themselves with firearms and post these photographs and videos on social media platforms such as Facebook and Instagram.

b. Persons often utilize social media platforms to send text messages, direct messages, or video chat, in reference to their unlawful possession, manufacture, and/or acquisition of firearms.

7. I believe there is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

3

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. On Wednesday July 20, 2022, this Affiant was notified by North Carolina State Bureau of Investigation (NCSBI) Special Agent (S/A) Tyner, an individual identified as KEVIN RAY FRIER appeared to be utilizing his Facebook Account (100079301172745), hereafter referred to as the SUBJECT ACCOUNT, to advertise the sale of "Glock Switch" devices. A "Glock Switch" is a device that, when affixed to the rear of a pistol, converts the firearm from semiautomatic fire to fully automatic fire. "Glock Switches" have been previously ruled as firearms and machineguns themselves by ATF's Firearms and Technology Division (FATD).

10. S/A Tyner then sent the following screenshot (captured June 13, 2022) of a post made by FRIER on April 10, 2022, at "7:17 PM" to this Affiant. In the post FRIER brags about a group of individuals utilizing "Glock Switch" devices he sold to them.

4



**Kevin Frier**
April 10 at 7:17 PM · 👥

Dem boys got my switches I dropped on em 💪💪💪 🔥



**DRILL Music** Poster based in **Poland** · April 9 at 8:00 PM
· Chicago, IL · 🌎

🔒 facebook.com

11.     This Affiant was also made aware by S/A Tyner that FRIER was utilizing the

SUBJECT ACCOUNT to post photographs of firearms. Tyner then sent the following screenshot

(captured May 31, 2022) to this Affiant from the SUBJECT ACCOUNT'S "story."

5



12.     FRIER is a previously convicted felon for making a false bomb report to a public building in 2017, and therefore prohibited from possessing firearms.

13.     On Thursday July 28, 2022, this Affiant was contacted by Scotland County Sheriff's Office Detective (Det.) Williams. Det. Williams advised this Affiant she had executed a Facebook search warrant on an account belonging to Timonte Purvis (100077197311716) in relation to a homicide investigation. Det. Williams advised this Affiant that she was able to observe a conversation between Purvis and the SUBJECT ACCOUNT through Facebook's

Messenger feature within the data obtained pursuant to the search warrant. Purvis provided this Affiant with screenshots of the messages.

14.     This Affiant reviewed the screenshots of the messages and observed the first message in the series was sent from the SUBJECT ACCOUNT to Purvis's account on June 9, 2022, at "18:28:04 UTC" stating "I got the ar stitches n glock switches." The SUBJECT ACCOUNT then sent the photo below at "18:28:14 UTC" to Purvis's account.



15.     The above photograph depicts what is consistent with this Affiant's knowledge and training to be a "drop-in seer." A "drop-in seer" is a device designed to convert a rifle from semiautomatic fire to fully automatic fire. These devices have been previously ruled as firearms and machineguns themselves by ATF's FATD.

16.     Purvis's account then responds and asks the SUBJECT ACCOUNT "…how much for each one" at "18:29:18 UTC." The SUBJECT ACCOUNT responds at "18:29:57 UTC" "I'll letcha get both for 200" followed by the photograph below, sent at "18:30:09 UTC."

7



17.     The above photograph depicts a device consistent with this Affiant's knowledge and training to be a "Glock switch" device. The skeletal tattoo depicted on the hand of the individual in the above photograph has been identified by Law Enforcement as belonging to FRIER.

18.     On Friday July 29, 2022, this Affiant submitted a preservation request to Meta Platforms Inc., for the SUBJECT ACCOUNT.

19.     On July 31, 2022, NCSBI S/A Tyner, provided this Affiant with the following screenshots of the SUBJECT ACCOUNT'S "story" (captured on July 30, 2022, and July 31, 2022, respectively).

 

20. The above photograph depicts what is consistent with this Affiant's training and experience to be a 3D printer constructing the frame of a pistol.

21. Based on the above information, there is probable cause to believe that violations of 18 U.S.C. §§ 922(g)(1), 922(o), and 933 have been committed, are being committed, and/or

will continue to be committed by FRIER and evidence thereof exists within the posts, photographs, messages, and other data pertaining to the SUBJECT ACCOUNT.

## BACKGROUND CONCERNING FACEBOOK[1]

22.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

24.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

_____

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

10

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

11

28.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

29.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user

12

accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

36. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

37. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can

indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

40.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

41.    Based on the foregoing, I request that the Court issue the proposed search warrant.

42.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

43.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).


Respectfully submitted,

/s/ Carmen E. L. Basgall

_____
Special Agent
ATF

15

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this affidavit this 9 day of August 2022.

The Honorable Joi E. Peake
United States Magistrate Judge

16

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with Facebook account 100079301172745 (active on, but not limited to, July 29, 2022) that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I. **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

   To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on July 29, 2022, (Meta Case Number 7126582) Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

   (a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   (b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from July 29, 2021, to July 29, 2022;

   (c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them July 29, 2021, to July 29, 2022, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

   (d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user July 29, 2021, to July 29, 2022, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account July 29, 2021, to July 29, 2022;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(q)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 922(g)(1), 922(o), and 933 involving KEVIN RAY FRIER since July 1, 2021, for each user ID identified on Attachment A, the form of the following:

(a)    Records and information revealing, referencing, or constituting the manufacture, possession, and sale of firearms, specifically machineguns;

(b)    Records and information revealing or referencing the proceeds of firearm sales;

(c)    Records and information revealing or referencing co-conspirators and customers; and

(d)    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC<br>RECORDS PURSUANT TO FEDERAL RULES OF<br>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my

title is _____. I am qualified to authenticate the records attached

hereto because I am familiar with how the records were created, managed, stored, and retrieved.

I state that the records attached hereto are true duplicates of the original records in the custody of

Meta. The attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Meta, and they were made by Meta as a regular practice; and

b. such records were generated by Meta's electronic process or system that produces

an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original

records; and

2. the process or system is regularly verified by Meta, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of

the Federal Rules of Evidence.

_____          _____

Date                                 Signature

2